

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CV-17-504

| | |
|---|---|
| | **Opinion Delivered** November 15, 2017 |
| LISA MICHELLE BEATY | |
| APPELLANT | APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT [NO. 72J-16-546] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | HONORABLE STACEY ZIMMERMAN, JUDGE |
| APPELLEES | AFFIRMED; MOTION TO WITHDRAW GRANTED |

## DAVID M. GLOVER, Judge

Lisa Beaty appeals the termination of her parental rights to her son, L.M., born May 13, 2016.[1] Pursuant to *Linker-Flores v. Arkansas Department of Human Services*, 359 Ark. 131, 194 S.W.3d 739 (2004), and Arkansas Supreme Court Rule 6-9(i), her counsel has filed a no-merit brief purporting to set forth all adverse rulings from the termination hearing and asserting that there are no issues that would support a meritorious appeal. Counsel has also filed a motion asking to be relieved. Although notified by the clerk of this court of her right to files pro se points of appeal, Beaty has not done so. We affirm the circuit court's termination of Beaty's parental rights and grant counsel's motion to withdraw.

---

[1]The parental rights of L.M.'s father, Anthony McKown, were also terminated; however, he is not a party to this appeal.

Cite as 2017 Ark. App. 621

*Standard of Review*

Termination of parental rights is a two-step process requiring a determination that the parent is unfit and that termination is in the best interest of the child. *Norton v. Arkansas Dep't of Human Servs.*, 2017 Ark. App. 285. The first step requires proof of one or more statutory grounds for termination; the second step, the best-interest analysis, includes consideration of the likelihood the juvenile will be adopted and of the potential harm caused by returning custody of the child to the parent. *Id.* Both steps require proof by clear and convincing evidence, which is the degree of proof that will produce in the finder of fact a firm conviction regarding the allegation sought to be established. *Id.*

Appellate review for termination cases is de novo, and our inquiry on appeal is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made. *Id.* In resolving the clearly erroneous question, the reviewing court defers to the circuit court due to its superior opportunity to observe the parties and to judge the credibility of witnesses. *Id.*

*Procedural History*

On July 8, 2016, the Arkansas Department of Human Services (DHS) was notified by Karis Chastain with Crimes Against Children Division that L.M. was hospitalized at Children's Hospital after being punched in the face by his father and suffering a traumatic-brain injury; L.M. also required use of a feeding tube due to his injury. L.M.'s father, Anthony McKown, was jailed for the domestic battery on his son, and Beaty was facing

charges of first-degree child endangerment and possibly possession of drug paraphernalia. The detective working the case had concerns that neither Beaty or McKown was mentally capable of caring for L.M. DHS took a hold on L.M. on July 9, 2016, due to McKown being incarcerated for L.M.'s injuries and Beaty facing charges for child endangerment. Based on these facts, DHS filed a petition for emergency custody of L.M. on July 12, 2016, and an ex parte order granting DHS emergency custody was entered the same day.

A probable-cause hearing was held on July 15, 2016, and an order was filed the same day continuing custody of L.M. with DHS. In the order, the circuit court found it necessary to continue custody of L.M. with DHS due to the severe injuries L.M. suffered at the hands of his father and because Beaty was being charged with endangering the welfare of a minor, with L.M. as the victim.

An adjudication hearing was held on September 1, 2016. In an adjudication order filed on October 3, 2016, the circuit court found L.M. had been subjected to aggravated circumstances due to a life-threatening injury and being left with McKown, who was a registered sex offender. In the order, the circuit court set forth L.M.'s extensive injuries, as well as testimony from Dr. Karen Farst, an expert in pediatrics and child-abuse pediatrics. Dr. Farst testified as follows: L.M. likely would not have survived without immediate medical attention; very aggressive treatment was required to save his life; his injuries stemmed from physical abuse; he had permanent brain damage and suffered from seizures because of his injuries; and he would have long-term impairment from the injuries. The circuit court specifically found McKown caused L.M.'s injuries and had subjected him to aggravated circumstances due to extreme cruelty and life-threatening injuries. It further

SLIP OPINION

found Beaty had subjected L.M. to aggravated circumstances by leaving him in McKown's care, although he was a registered sex offender. Neither Beaty nor McKown appealed the adjudication-order findings.

DHS filed a motion to terminate reunification services on October 6, 2016, on the basis that L.M. had been subjected to aggravated circumstances by both parents. Then, on November 8, 2016, a permanency-planning hearing was held, as well as a hearing on the no-reunification services motion. The circuit court filed both a no-reunification order and a permanency-planning order on November 18. The basis for the no-reunification order was that both parents had subjected L.M. to aggravated circumstances. In the permanency-planning order, the circuit court determined the goal of the case was to be changed to adoption; it also found DHS had made reasonable efforts to provide family services.

DHS filed a petition to terminate parental rights on December 5, 2016, alleging termination was in L.M.'s best interest. For grounds to terminate Beaty's parental rights, DHS alleged the fact the juvenile had been found dependent-neglected as a result of neglect or abuse that could endanger the life of the child and was perpetrated by the juvenile's parent or parents, the subsequent-factor ground, and the aggravated-circumstances ground.[2] On March 28, 2017, after a hearing on February 16, 2017, the circuit court filed an order terminating Beaty's parental rights on all three bases, finding termination was in L.M.'s best interest. Beaty filed a timely notice of appeal.

---

[2]Ark. Code Ann. § 9-27-341(b)(3)(B)(vi), (vii), and (ix)(3) (Repl. 2015).

*Termination Hearing Testimony*

Extensive medical and lay testimony was introduced at the termination hearing. Dr. Farst testified by telephone at the termination hearing as an expert in the areas of child-abuse pediatrics and general pediatrics. She described L.M.'s injuries: extensive bruising to the left side of his head, as well as some bruising on his lower back, buttocks, and knee; a large, left-sided skull fracture; a subdural hemorrhage on the surface of the brain as well as between the two lobes of the brain; retinal hemorrhages in the back of both eyes; and a retinal fold on his left eye. She further explained L.M. had developed encephalomalacia, or areas of permanent brain damage, as a result of the abuse; he had to remain on medication to control seizures related to his brain injury; and he had to have a feeding tube (gastrostomy) placed in his stomach because he did not regain the ability to eat on his own and support his nutrition. She attributed L.M.'s injuries to the result of physical abuse. Dr. Farst then explained that due to the areas of permanent brain injury, L.M. suffered developmental delays; his brain was not growing as a normal infant's brain would grow; and because the brain was not growing due to injury, the skull was not receiving signals to grow and expand, and therefore the suture lines between the plates of the skull had prematurely fused. The doctor stated the problems with a premature fusing of the suture lines were that, even though L.M.'s brain was not growing as a normal infant's brain, there should still be some additional brain growth in the areas not damaged by the abuse; however, when the skull bones fuse too early, it restricts the healthy part of L.M.'s brain from growing, thus limiting the growth and development of the healthy parts of his brain. She explained the early skull fusion could also cause increased pressure to build up in the brain, which could affect vital

5

functions such as normal breathing and heart rate; this issue would require future surgical intervention in order to actually create some separation between the skull plates to allow there still to be a period of brain growth. A CAT scan of L.M.'s brain was compared to a CAT scan of a healthy infant brain; much of the area of L.M.'s brain was dark black, indicating permanent brain damage, and his skull was misshapen. Dr. Farst reiterated if L.M. had not received medical care, he would not have survived the physical abuse and the resultant brain injuries; that he had to be placed on life support in order to survive his injuries. As for a long-term prognosis, Dr. Farst could only say that due to the areas of permanent brain damage, L.M. would have some degree of long-term developmental struggle; he was facing at least two "very significant" surgeries to reshape his skull; and he was at risk for long-term complications of problems with his brain, such as seizures, and abnormal development.

Rachel Reader, L.M.'s assigned caseworker, testified L.M. had been in only one placement since coming into care, and that placement was a possible adoptive one. Reader stated she absolutely believed L.M. was an adoptable child. It was her opinion L.M. could not be safely returned to Beaty because Beaty did not believe L.M.'s injuries were as extensive and severe as they actually were. Reader felt Beaty thought DHS was overexaggerating L.M.'s injuries. Reader said she did not believe Beaty took L.M.'s injuries seriously, and she did not seem to believe McKown had committed the injuries. Furthermore, Reader stated Beaty had not been completely compliant with DHS. Reader believed L.M. was safe with his foster family and their understanding of his medical conditions.

As the caseworker, she testified she was unsure if L.M.'s paternal grandparents would be an appropriate placement for L.M. She explained that the paternal grandparents had placed a letter from McKown in a basket of Christmas gifts meant for L.M., even though there was a no-contact order between McKown and L.M., and this alarmed L.M.'s foster mother.

Anthony McKown testified he was currently incarcerated on a first-degree domestic-battery charge. He admitted he was a registered sex offender and had previously pled guilty to second-degree sexual assault, domestic battery, and fourth-degree sexual assault. He admitted he sent a Christmas card to L.M., even though he thought it might be a violation of the no-contact order, because he missed L.M.

Holly, L.M.'s foster mother, testified it could be a struggle to care for all of L.M.'s health issues at times, detailing his developmental delays as well as the manner in which L.M. required his food to be taken through the gastrostomy tube. However, she further testified that, if parental rights were terminated, her family wanted to adopt L.M. because he had "stolen" their hearts. She said his medical issues just made them love him more; that they understood L.M. might need lifetime care but they were definitely prepared to take that on; and L.M. was a great baby. Holly stated that she had witnessed visits between L.M. and his paternal grandparents, and she was willing to allow continued visitation if she was able to adopt L.M.

Beaty testified on her own behalf. She stated she was living with her mother and stepfather in the house where she had lived for most of her life. Beaty blamed L.M.'s problems on being born two weeks early and having low platelets as a result of intrauterine

growth restriction (IUGR), which caused bruising. She said she understood L.M.'s brain injuries but they did not matter to her—she only wanted him to be healthy and happy. Beaty said that mental-health problems ran in her family, but she did not care if he was special or not, they would "work it out." Beaty stated she understood L.M. would need a lot of medical care for the rest of his life, but she could provide that care. It was her goal to open an account for L.M. and put money into it for his college education. She claimed she was taking the case seriously, but she said she did not cause the injuries and did not believe L.M. was struck by something or someone to cause the injuries; she believed his problems were caused by IUGR. Beaty did not believe McKown had abused their child because she had not seen McKown hit L.M.

Phyllis McKown, L.M.'s paternal grandmother, testified she and her husband had been visiting with L.M. and desired to continue visits if possible. She detailed the items she had been able to provide to L.M.'s foster mother for his benefit, such as a stroller, clothing, diapers, and toys. She believed L.M. was in a good foster home that was meeting all his needs. She admitted she had placed a Christmas card from her son in with Christmas gifts for L.M., but she claimed she told the DHS worker that if it was not appropriate, to not give the card to L.M.'s foster mother. She testified that while she would love to adopt L.M., it would not be in his best interest. She knew L.M. would need more care than a normal child, and she did not believe his parents would be able to provide what L.M. needed.

The circuit court terminated Beaty's parental rights on all bases alleged. Furthermore, it specifically ordered that the paternal grandparents were not to be allowed to have visitation, and refused to grant a last visit between L.M. and his parents.

*Termination of Parental Rights*

While the circuit court terminated Beaty's parental rights on three bases, only one ground must be proved. *Baxter v. Arkansas Dep't of Human Servs.*, 2017 Ark. App. 508. One of the grounds relied upon by the circuit court was that of aggravated circumstances. The finding of aggravated circumstances was made by the circuit court in the adjudication order, which is an appealable order. A challenge to a finding of abuse or aggravated circumstances must be made, if at all, in an appeal from the adjudication hearing. *Hannah v. Arkansas Dep't of Human Servs.*, 2013 Ark. App. 502. Beaty never appealed the aggravated-circumstances finding from the adjudication hearing; therefore, she cannot now challenge that finding at this stage of the case. The unchallenged finding of aggravated circumstances provides the statutory ground to support the termination of Beaty's parental rights.

The circuit court also found it in L.M.'s best interest to terminate Beaty's parental rights. A best-interest finding must be based on the trial court's consideration of at least two factors: (1) the likelihood that the child will be adopted if parental rights are terminated, and (2) the potential harm caused by continuing contact with the parent. *Baxter, supra.* It is the overall evidence—not proof of each factor—that must demonstrate termination is in the child's best interest. *Baxter, supra.*

As to the adoptability aspect of the best-interest analysis, the caseworker testified that L.M. was adoptable and that his foster placement was interested in adopting him, even given his medical needs. His foster mother confirmed that her family wished to adopt L.M. if parental rights were terminated. Regarding potential harm, Beaty's testimony indicated that she did not fully grasp the serious nature of L.M.'s medical injuries or the rigorous daily care

L.M. would require. She refused to believe that McKown inflicted the grievous injuries on L.M., believing instead that L.M.'s problems were caused by IUGR. Furthermore, despite Dr. Farst's explanation of L.M.'s injuries, Beaty testified she was going to open an account for him so that he could go to college. This demonstrates a marked lack of understanding on Beaty's part of the seriousness of L.M.'s injuries and the level of care he would require for his lifetime, which Beaty was not prepared to provide. The trial court's determination that it was in L.M.'s best interest for Beaty's parental rights to be terminated was not clearly erroneous.

There were several rulings adverse to Beaty that were not discussed by counsel. However, even if an adverse ruling is omitted from a no-merit brief in a termination case, we may affirm if the ruling would clearly not constitute a meritorious ground for appeal. *Brown v. Arkansas Dep't of Human Servs.*, 2017 Ark. App. 303, 521 S.W.3d 183. This is the case regarding the omitted adverse rulings in this case.

There were three instances where the circuit court considered testimony to be hearsay; on two occasions, the circuit court sua sponte interrupted questioning and told the witnesses they could not testify as to what someone else said because it was hearsay, and on the third occasion, DHS objected on the basis of hearsay. None of these evidentiary rulings were an abuse of discretion, and they could not provide a meritorious ground for reversal.

The trial court sua sponte admonished Beaty's counsel that she could not testify for her client and also cut off Phyllis McKown's testimony about IUGR babies on cross-examination when Beaty's counsel asked McKown where she had received her medical

training and McKown said she had no medical training. Even if these instances could be construed as adverse rulings, they would not provide a meritorious basis for reversal.

After examining the record and Beaty's counsel's brief, we have determined that this appeal is wholly without merit. Therefore, we affirm the order terminating Beaty's parental rights and grant her counsel's motion to withdraw.

Affirmed; motion to withdraw granted.

HARRISON and VAUGHT, JJ., agree.

*Leah Lanford*, Arkansas Public Defender Commission, for appellant.

One brief only.